# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In Re:

CASE NO.: 6:08-bk-04327-KSJ

MIRABILIS VENTURES, INC.,

CHAPTER 11

    Debtor.

_____/

MIRABILIS VENTURES, INC.,

    Plaintiff,

ADV. PRO. NO.:

v.

PAUL GLOVER, individually,

    Defendant.

_____/

## MIRABILIS VENTURES, INC.'S
## ADVERSARY COMPLAINT AGAINST PAUL GLOVER

Plaintiff, Mirabilis Ventures, Inc., ("MVI" or "Mirabilis"), by and through its undersigned attorneys, and pursuant to Rule 7004, *Federal Rules of Bankruptcy Procedure*, hereby sues Defendant, PAUL GLOVER ("Glover" or "Defendant"), an individual, and objects to Claim No. 5 and Claim No. 6 filed by Glover (the "Glover Proofs of Claim"). In support thereof, Mirabilis states as follows:

### NATURE OF ACTION

1.     This is an adversary proceeding to: (i) recover damages from Glover for his breach of fiduciary duty; (ii) objecting to the Glover Proofs of Claim that arise out of his employment with Common Paymaster Corporation ("CPC"); and (iii) alternatively, an action for fraudulent transfer under 11 U.S.C. §544, §548 and §550 as well as Florida Statutes §§ 726.105(1)(A) and (B), 726.106(1) and 726.108.

1

## JURISDICTION, VENUE, AND PARTIES

2.      This Court has jurisdiction over this adversary proceeding by virtue of 28 U.S.C. §§ 157 and 1334.

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      Plaintiff, Mirabilis, is a Nevada corporation with its principal place of business located at 341 N. Maitland Ave., Suite 201 in Maitland, Florida.

5.      Defendant, Paul Glover, is an individual who resides in Winter Park, Orange County, Florida.

## PROCEDURAL AND FACTUAL HISTORY

6.      On or about January 25, 2006, Glover entered into an employment agreement (the "Employment Agreement") with Common Paymaster Corporation ("CPC").  A true and correct copy of the Employment Agreement is attached hereto as **Exhibit "A."**

7.      Pursuant to the terms of the Employment Agreement, Glover was hired to work for CPC as a Master Strategist.

8.      CPC provided general business consulting activities as well as human resource services to a number of different companies.

9.      Pursuant to the terms of the Employment Agreement, Glover received compensation and regular paychecks from CPC, not Mirabilis or any other entity.

10.     Pursuant to the terms of the Employment Agreement, Glover entered into a non-compete agreement that restricted Glover from directly competing against CPC in

the same or similar capacity for three (3) years following Glover's working relationship with CPC under the Employment Agreement. *See* Section 8, Exhibit "A".

11.     On or about March 6, 2007, Glover voluntarily resigned from his position as Master Strategist and otherwise ceased employment under the Employment Agreement.

12.     During Glover's tenure as a Master Strategist, Glover appointed as Executive Vice President and Treasurer of Mirabilis.   In this regard, Glover was responsible for the strategic financial maintenance of Mirabilis and owed Mirabilis the duties of good faith and loyalty as well as other fiduciary duties.   However, Glover's appointment as an officer of Mirabilis was a completely and distinct appointment from his employment as a Master Strategist with CPC.

13.     During this time, Glover and other Mirabilis executives were notified that a federal grand jury investigation had commenced with regard to the operation of Mirabilis.   Subsequently, the United States of America filed an *in rem* civil forfeiture action against the assets of Mirabilis, based upon the criminal investigation of Frank Amodeo ("Amodeo").

14.     Amodeo was never an officer or director of Mirabilis.   However, while Glover was an officer of Mirabilis, Amodeo took actions that damaged Mirabilis and were instrumental in leading Mirabilis to bankruptcy, including signing checks and other legal documents on behalf of Mirabilis, when he had no authority to take such actions.

15.     Glover knew or should have known that Amodeo took these actions, failed to take any actions to protect Mirabilis, and as a result breached his duty of faith to Mirabilis.

16. On May 27, 2008, the Debtors filed voluntary petitions for relief with the United States Bankruptcy Court for the Middle District of Florida: *In re Mirabilis Ventures, Inc.*, Case No. 6:08-bk-04327-KSJ, *In re Hoth Holdings, LLC*, Case No. 6:08-bk-04328-KSJ, and *In re AEM, Inc.*, Case No. 6:08-bk-04681 (the "Bankruptcy Cases") (Doc. No. 1).

17. On October 27, 2009, the Court entered an Order confirming the Debtors' Joint Plan of Liquidation (the "Plan"). (Doc. No. 375).

18. On June 18, 2008, Glover filed his first proof of claim in the Mirabilis Bankruptcy Case alleging that he is entitled to the sum of $458,379.00 for services performed under his Employment Agreement with CPC ("Claim No. 5"). Glover contends that $10,950.00 of the amount is entitled to priority treatment under 11 U.S.C. § 507(a)(4), and that $879.20 of the amount is entitled to priority treatment under 11 U.S.C. § 507(a)(5).

19. Glover bases his claim on the alleged facts that: (i) Glover was entitled to $360,000.00 based on unpaid guaranteed minimum bonus compensation; (ii) $90,000.00 based on severance pay; (iii) $879.20 based on unpaid life insurance premiums; and (iv) $7,500.00 based on an unpaid wages check for the period ending March 5, 2007.

20. On June 20, 2008, Glover filed his second proof of claim in the Mirabilis Bankruptcy Case alleging that he was entitled to the sum of $2,854,949.39 for the alleged redemption of 2,750 Green Shares in Mirabilis (the "Stock") for an unsecured promissory note (the "Note").

## COUNT I – AMENDED OBJECTION TO CLAIM NO. 5

21.     Mirabilis re-alleges and re-states paragraphs 1 through 20 above, as if fully set forth herein.

22.     First, Glover's Claim No. 5 arises entirely out of his Employment Agreement with CPC.  Mirabilis is a completely separate legal entity from CPC.

23.     There are no agreements or facts that would indicate Mirabilis assumed the liabilities of CPC.  Glover has failed to provide any proof of the same.  Therefore, Glover has failed to submit any evidence that would demonstrate Mirabilis is responsible for this alleged debt and Claim No. 5 must be disallowed in its entirety.

24.     Second, even if the Employment Agreement was with Mirabilis, Glover's Claim No. 5 fails.

25.     Glover claims he is entitled to $360,000.00 from Mirabilis for "unpaid guaranteed minimum bonus compensation."  Glover basis this claim on that certain letter described as "Exception Letter to Employment Agreement with Common Paymaster Corporation".   Glover alleges that the letter provides him a bonus in the amount of $90,000.00 a quarter for four (4) quarters.  However, this letter only references a January 30, 2006 employment agreement, not the Employment Agreement executed on January 5, 2006.  As such, Glover has failed to produce the documents which underlie this alleged agreement for bonus payments.  As such, Glover's claim for bonus payments fails.

26.     Furthermore, Glover contends that he is entitled to the sum of $90,000.00 for a severance payment.  However, pursuant to the terms of the Employment Agreement, and by his own admission, Glover resigned from employment with CPC.  There is no

event under the Employment Agreement that entitles Glover to severance after his voluntary resignation. Therefore, Glover is not entitled to "severance."

27. Next, Glover claims that he is entitled to $10,950.00 for unpaid wages under 11 U.S.C.§507(a)(4). However, under §507(a)(4), Glover is only entitled to priority treatment for wages earned within 180 before the Petition Date. The Petition Date was May 27, 2008. By his own admission, Glover voluntarily resigned from employment with CPC in March 2007. Glover has failed to meet the time requirements under §507 and his alleged claim is not entitled to priority treatment.

28. Lastly, Glover alleges that Claim No. 5 is entitled to priority treatment to the extent of $879.20 under §507(a)(5). However, similar to §507(a)(4), Glover would only be entitled to such benefits earned within 180 days before the date of the filing of the Petition Date. Glover has again failed in this regard.

29. In short, and for the reasons stated above, Glover's Claim No. 5 must be disallowed in its entirety.

WHEREFORE, Mirabilis Ventures, Inc. respectfully requests this Court enter an order disallowing Claim No. 5 in its entirety, and for such further relief this Court deems just and proper.

## COUNT II – AMENDED OBJECTION TO CLAIM NO. 6

30. Mirabilis re-states and re-alleges paragraphs 1 through 20 as if fully set forth herein.

31. Glover's Claim No. 6 has no legal or factual support and must be disallowed in its entirety.

32.     Glover's Claim No. 6 is based on the existence and value of 2,750 Green Shares of Stock in the Debtor as of March 6, 2007.  In support of his claim, Glover alleges that on the date of his resignation he was entitled to have the Stock redeemed for the Note, essentially transforming equity into debt.

33.     In support, Glover cites Mirabilis' alleged Articles of Incorporation, which states "pursuant to the terms of the Mirabilis Ventures, Inc. Green Shares of stock, 'Upon termination, retirement, resignation, or legal determination of incompetence (hereinafter collectively referred to as "Triggering Event") of a Shareholder of Green Shares, then said Green Shares shall be redeemed by the Company at a price of $1,000 per Green Share with such payment being made in the form of an unsecured promissory note payable in equal installments, over a period of sixty (60) months, and accruing simple interest at the rate of three (3%) percent per annum.'"

34.     However, Glover's allegations have no legal or factual support.  First, as admitted by Glover, the "Mirabilis Stock Certificate issued August 2, 2006 proved to be invalid through confirmation with the state of Nevada regarding the absence of a Certificate of Designation."  As such, the Stock was never issued as valid and Glover can not redeem invalid stock.

35.     Second, as of the date of the alleged transfer, the Stock had no value.  The Stock in Mirabilis, as of March 2007, was worth $0.00. As such, the conversion of worthless stock is not only a fraudulent transfer (as alleged below), but also renders the value of said claim to be $0.00.

36.     Lastly, Glover has failed to produce or attach any alleged promissory to support his claim that he had an executed promissory note from Mirabilis.  A proof of

claim is only valid as prima facie evidence if the claimant attaches the documents that support its proof of claim. *See In re* Carty, 2005 WL 3198617 (Bankr.S.D.Fla. 2005) (disallowing claim in its entirety where party failed to attach vital documents upon which the alleged claim was based, including receipts and promissory notes).

37.     Without the Promissory Note, Glover's Claim No. 6 fails. Accordingly, Mirabilis asserts that Claim No. 6 must be disallowed in its entirety.

38.     In the alternative, Mirabilis stated that Claim No. 6 is based on Glover's alleged equitable interest in Mirabilis, rendering Claim No. 6 an equitable claim, not an unsecured claim, as it was characterized by Glover. As such, Mirabilis requested this Court to reclassify Claim No. 6 as an allowed equitable interest claim.

WHEREFORE, Mirabilis Ventures, Inc. respectfully requests this Court enter an order disallowing Claim No. 6 in its entirety, and for such further relief this Court deems just and proper. Alternatively, Mirabilis Ventures, Inc. requests this Court to reclassify Claim No. 6 as an equitable interest claim.

## COUNT III – BREACH OF FIDUCIARY DUTY

39.     Mirabilis re-asserts and re-alleges paragraphs 1 through 20 above, as if fully set forth herein.

40.     Upon information and belief, from January 25, 2006 to March 6, 2007, Glover served as a corporate officer of Mirabilis in his capacities of Executive Vice President and Treasurer of Mirabilis.

41.     During that time, a fiduciary relationship existed between Mirabilis, its subsidiaries and related companies, and Glover.

42.     Glover breached his fiduciary duty to Mirabilis by failing to properly supervise the activities of Frank Amodeo ("Amodeo"), who was not an officer nor a director of Mirabilis.

43.     Glover allowed Amodeo to take actions on behalf of Mirabilis, which led to the federal grand jury investigation (the "Investigation"). The Investigation was leaked to the press, resulting in several negative articles, which ultimately destroyed the reputation and operations of Mirabilis.

44.     As a direct and proximate result of Glover's breach of fiduciary duties, Mirabilis has been damaged in its business and property, and accordingly, seeks compensatory damages.

WHEREFORE, Mirabilis Ventures, Inc. respectfully requests this Court enter judgment in its favor, and against Paul Glover awarding Mirabilis compensatory damages, its costs and such further relief this Court deems just and proper.

## COUNT IV – FRAUDULENT TRANSFER UNDER 11 U.S.C. §§544, 548 AND 550 (PLEAD IN THE ALTERNATIVE)

45.     Mirabilis re-asserts and re-alleges paragraphs 1 through 20 above, as if fully set forth herein.

46.     Count IV, is plead in the alternative to Counts I-II, as stated above.

47.     To the extent this Court finds Glover is entitled to an allowed unsecured claim based upon the Note, Mirabilis objects pursuant to 11 U.S.C. § 502(d)[1], and requests the Claim be disallowed in its entirety unless and until Glover refunds to the

---

[1] Section 502(d), in material part, provides that the court shall disallow any claim of any entity from which property is recoverable under section… 550… of this title or that is a transferee of a transfer avoidable under section… 544, 548… of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under… this title.

bankruptcy estate the value of the Note as a voidable fraudulent transfer, pursuant to 11 U.S.C. §§ 544, 548 and 550.

48. Section 502(d) is designed to foster the "restoration" of assets to a debtor's estate, thereby assuring "equality of distribution" of the estate's assets by precluding anyone who has received a voidable transfer from sharing in any distribution or burdening an estate with continuing litigation unless he first pays back any voidable transfer that he has received. Keppel v. Tiffin Sav. Bank, 197 U.S. 356 (1905); Irving Trust Co. v. Frimitt, 1 F.Supp. 16, 18 (S.D. N.Y. 1932); Matter of Mid Atlantic Fund, Inc., 60 B.R. 604, 609-10 (Bankr. S.D. N.Y. 1986).

49. The entry of a judgment in an Adversary Proceeding is not a prerequisite to the disallowance under section 502(d) of the creditor's claim. *See In re* Chase & Sanborn Corp., 124 B.R. 368, 370 (Bankr. S.D. Fla. 1991).

50. To the extent this Court finds that Glover is entitled to either of his claims, Mirabilis should be able to avoid the Claim as a fraudulent transfer under Sections 544 and 548 of the Bankruptcy Code,.

51. Pursuant to 11 U.S.C. § 550(a), the recovery of the value of property for the benefit of a debtor's estate is authorized to the extent that a transfer is avoided under 11 U.S.C. § 548.

52. Section 548 of the Bankruptcy Code states that a debtor may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily – "(B)(i) received less than a reasonably

equivalent value in exchange for such a transfer or obligation; and (ii) was insolvent on the date that such transfer was made or such obligation was incurred…"

53.     According to Glover, on March 6, 2007, less than two years before Mirabilis' Petition Date of May 27, 2008, Glover redeemed 2,750 shares of Green Stock in exchange for the Note (the "Transfer").

54.     Mirabilis did not receive reasonably equivalent value from Glover in exchange for the Transfer.

55.     Mirabilis was insolvent on March 6, 2007, the date the Transfer was made, and remained insolvent continuously thereafter.

56.     As a result, Mirabilis requests that, to the extent that this Court does find that Glover is entitled to an allowed amount for Claim No. 6, the Claim should be disallowed in its entirety unless and until Glover refunds the value of the Note to the bankruptcy estate as a voidable fraudulent transfer, pursuant to 11 U.S.C. §§ 544, 548 and 550.

**WHEREFORE**, Mirabilis requests that this Court enter an order: (i) allowing Mirabilis to avoid the Transfer unless and until Glover refunds to Mirabilis' estate the value of the Note as a fraudulent transfer; (ii) awarding prejudgment interest at the maximum rate allowed by law; (iii) awarding court costs; and (iv) awarding any other relief this Court deems appropriate.

## COUNT V – FRAUDULENT TRANSFER UNDER 11 U.S.C. §§ 544 AND 550, and FLA. STAT. §§ 726.105(1)(A) and (B), 726.106(1) and 726.108 (PLEAD IN THE ALTERNATIVE)

57.     Mirabilis re-asserts and re-alleges paragraphs 1 through 20 above, as if fully set forth herein.

58.     Count V is pled in the alternative to Counts I-II, as stated above.

59.     To the extent this Court finds that Glover is entitled to either of his Claims, such Claims is subject to avoidance as a fraudulent transfer under FUFTA and the Bankruptcy Code.

60.     Section 544(b) of the Bankruptcy Code states that a debtor may avoid any transfer of an interest in the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim allowable under Section 502 of the Bankruptcy Code.

61.     Florida Statute § 726.106 states that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer.   If a transfer is found to be fraudulent, a creditor may avoid such transfer.  Fla. Stat. § 726.108.

62.     According to Glover, on March 6, 2007, Glover redeemed 2,750 shares of Green Stock in Mirabilis in exchange for a Promissory Note from Mirabilis.

63.     Mirabilis received no reasonable equivalent value in exchange for this Transfer.

64.     Mirabilis was insolvent on March 6, 2007, the date the Transfer was made, and remained insolvent continuously thereafter.

65.     There is at least one actual holder of an allowed unsecured claim pursuant to 11 U.S.C. § 502, who would have standing to assert a claim for relief under FUFTA.

66.     As such, the Transfer was fraudulent and is avoidable by Mirabilis under Fla. Stat. § 726.108(1)(a) and 11 U.S.C. § 544(b).

67. Pursuant to 11 U.S.C. § 550(a), the recovery of property for the benefit of the Debtor's estate is authorized to the extent the original transfer is avoided under 11 U.S.C. § 544(b) and FUFTA.

68. Consequently, Glover, as the transferee of the avoided transfer, is liable to Mirabilis for the value of the Transfer.

69. As such, to the extent this Court finds that Glover is has any allowed amount under Claim No. 6, such Claim is subject to avoidance as a fraudulent transfer under FUFTA and the Bankruptcy Code.

**WHEREFORE**, Mirabilis requests that this Court enter an order: (i) allowing Mirabilis to avoid the Transfer unless and until Glover refunds to Mirabilis' estate the value of the Note as a fraudulent transfer; (ii) allowing Mirabilis to recover the value of the transfer from Glover; (iii) awarding prejudgment interest at the maximum rate allowed by law; (iv) awarding court costs; and (v) awarding any other relief this Court deems appropriate.

**RESPECTFULLY SUBMITTED** this _2nd_ day of February 2010.

/s/ Mariane L. Dorris
Mariane L. Dorris
Florida Bar No. 0173665
mdorris@lseblaw.com
Justin M. Luna
Florida Bar No. 0037131
Victoria I. Minks
Florida Bar No. 0064388
Latham, Shuker, Eden & Beaudine, LLP
390 North Orange Avenue, Suite 600
Orlando, Florida 32801
Telephone: (407) 481-5800
Facsimile: (407) 481-5801
Attorneys for Debtor/Plaintiff

# EMPLOYMENT AGREEMENT

This Agreement made on the 5th day of January, 2008, between **Common Paymaster Corporation,** a Florida corporation, with its principal office located at 20 North Orange Avenue, Suite 1400, Orlando, Florida 32801, hereinafter referred to as "**Employer,**" and **Paul Glover,** who resides at 1312 Winter Springs Boulevard, Winter Springs, Florida 32708, hereinafter referred to as "**Employee.**" **Employer** and **Employee** are hereinafter jointly referred to as the "**Parties.**"

**WHEREAS, Employer** provides general business consulting activities to a number of different companies, which may or may not be affiliated or controlled by **Employer,** and

**WHEREAS, Employee** seeks to secure a position with **Employer. Employer** desires to hire **Employee** for that position under the terms set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and other good and valuable consideration received in hand, the sufficiency and receipt of which is hereby acknowledged, the **Parties** agree as follows:

## TERMS AND CONDITIONS

### 1.    NATURE OF EMPLOYMENT

(a)    **Employer** hereby hires **Employee** and **Employee** accepts such employment and agrees to perform at all times faithfully, industrially, and to the best of his ability, experience and talent, all the duties **Employer** may require of him pursuant to the expressed and implicit terms of this Agreement. **Employee,** during the term of this Agreement, agrees to diligently perform all services that may be assigned to him and shall exercise such powers and authority as may, from time to time, be delegated to him, including such powers and authority usually pertaining and attributed by law, custom, or otherwise to a management level associate in a professional firm. The initial primary classification for **Employee** will be as **Master Strategist** (the "Initial Primary Classification"), and **Employee**'s title shall be Executive Vice President. **Employee**'s Job Description is set forth in Schedule "A," attached hereto and incorporated by reference herein.

(b)    **Employer** shall have the right, in its sole discretion, to change the job description to include responsibilities reasonably related to the position or to remove responsibilities from the description of the position.

(c)    **Employee** acknowledges that by signing this Agreement **Employee** shall be available to any of **Employer's** affiliates during the Employment Term of this Agreement.

(d)    **Employee** hereby acknowledges that he has received a copy of the Employee Handbook and has reviewed its provisions. **Employee** agrees to comply with **Employer's** policies and procedures as set forth in the Employee Handbook. **Employee** agrees to follow the policies and procedures set forth in Schedule "B," attached hereto and incorporated by reference herein, regardless of whether such policies and procedures are set forth in the Employee Handbook.

### 2.    DURATION OF THIS AGREEMENT

**Employer** employs **Employee,** and **Employee** accepts such employment with **Employer,** for a period of thirty-six (36) months, beginning on January 30, 2006 and terminating on January 29, 2009. As used in this Agreement, "Employment Term" refers to the period of employment of **Employee** under this

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 1 of 15

Initials _____
Employee

(Ver H05)

**EXHIBIT "A"**

Agreement, whether for the aforementioned period above, termination earlier as provided elsewhere in this Agreement, or as extended by mutual agreement of **Employer** and **Employee**.

## 3. COMPENSATION AND BENEFITS

(a) **Employer** shall pay **Employee**, and **Employee** agrees to accept from **Employer**, in full payment for **Employee's** services under this Agreement, the Compensation as set forth opposite **Employee's** Initial Primary Classification in Schedule "C" attached hereto and incorporated by reference herein.

(b) In addition to the Compensation set forth in Paragraph 3(a) hereinabove, **Employee** shall be entitled to _____ () directorship(s) in **Employer** and/or its affiliated companies, which shall be in **Employer's** sole and absolute discretion, and shall be compensated _____ () per month for the directorship(s) position(s); provided, however, that **Employee's** directorship(s) compensation shall never be greater than the "Directors Fee (Incentive Compensation)" set forth in Schedule "C-1a" attached hereto and incorporated by reference herein.

(c) **Employee** shall receive no other fringe benefits, and disability, medical, dental, life or other insurance except those benefits that are generally available to any employee of **Employer**.

(d) **Employee** shall be granted considerable autonomy on establishing **Employee's** schedule. **Employee** shall exercise informed and reasonable judgment concerning appropriate hours and vacation time. Notwithstanding anything to the contrary contained in the Employee Handbook, **Employee** may not receive lesser benefits than the benefits contained in the Handbook in effect at the execution date of this Agreement.

(e) **Employer** shall reimburse **Employee** for all actual, reasonable and necessary business expenses incurred by **Employee** in connection with the business of **Employer**. Payments to **Employee** for such business expenses shall be made within seven (7) days after receipt of an approved expense report from **Employee**, or such ordinary day of the calendar month as **Employer** pays employees' accounts, whichever day is later in time. **Employer** shall determine whether expense reports are to be submitted weekly or monthly.

(f) **Employee's** entitlement to receive Compensation under this Agreement shall be offset against any other compensation otherwise paid to **Employee** under any employment arrangement with **Employer** or any **Employer** affiliate (regardless of the number of years), on a cumulative basis from the date of execution of this Agreement.

(g) Notwithstanding any other provision regarding dispute resolution set forth elsewhere in this Agreement, any dispute regarding the Compensation shall be exclusively decided in accordance with the laws of the State of Florida. Such dispute shall first be submitted to non-binding mediation and shall thereafter be determined by final binding arbitration, and not litigation, with the agreed venue for mediation and arbitration being in Orlando, Florida. The mediation and, if needed, arbitrator, shall be selected in each case by the applicable regional manager of **Employer** and by **Employee**. In the event of a disagreement between Employer and Employee as to the arbitrator, the parties shall have a mutually agreeable independent third party select an arbitrator. **Employee** agrees to waive all other enforcement rights with respect to any dispute regarding the Compensation.

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 2 of 15

Initials _____
Employee

(Ver H05)

## 4. TERMINATION/SEVERANCE

(a) Notwithstanding any contrary provision in this Agreement, **Employer** may terminate this Agreement for cause without notice. For the purpose of this paragraph, "cause" is defined as (1) **Employee** convicted of, or pleading guilty or no contest to, a felony under applicable law; (2) Willful material breach of **Employee's** fiduciary duty to **Employer**; (3) **Employee** willfully failing to perform any material explicit or implicit duty that is within the normal duties of **Employee** or is a reasonable request or directive of **Employer**; (4) **Employee** committing any breach of a material term of this Agreement, provided that **Employee**, after receiving twenty (20) days written notice from **Employer**, has not cured such breach; (5) **Employee** willfully failing to adhere to any material rule, policy or directive set forth by **Employer**; (6) **Employee** committing willful insubordination, corruption and/or disruption in the workplace; or (7) **Employee** committing a harassment violation of law against an employee, affiliate, owner, client, invitee, or licensee of **Employer**.

(b) Upon termination, **Employee** shall immediately provide to **Employer** all documents and items of any nature or description, including computer files, that pertain to actual potential customers or leads that **Employee** developed or obtained during employment, any phase or aspect of **Employer's** operations, any phase or aspect of **Employer's** future operations or plans, and any other items, lists, documents, or the like, that in any way may pertain to **Employer's** business.

(c) Except for termination of **Employee** due to breaches of paragraphs 4(a)(1) and 4(a)(7) above, if **Employer** terminates this Agreement for any reason, including for cause, or as a result of a merger, acquisition, sale or "Change in Control" (as defined below in paragraph 4(e)), in addition to the Compensation up until date of termination, **Employee** shall be entitled to a lump sum severance payment within thirty (30) days of the termination date of employment. This severance payment shall be an amount equal to one (1) month's base compensation for every two (2) years of employment by **Employee** under this Agreement, but shall never be less than one (1) month's base compensation.

> *For illustrative purposes:* If Employee's average monthly Base Compensation is $8,000, and Employee has worked for 4 years and 3 months and is terminated, Employee is entitled to $8,000 times 2 = $16,000.

(d) In the event it shall be determined that any payment, distribution or other action by **Employer**, to or for the benefit of **Employee**, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, would be taxable as an excise tax under the Internal Revenue Code 1986, **Employer** shall make a payment to **Employee** in an amount equal to any such excise tax imposed upon said payments. Should any interest or penalties accrue to **Employee** with respect to any such excise tax, **Employer** will also reimburse those costs.

(e) For purposes of this Agreement, the term "Change in Control" shall be defined as:

(i) The approval by the shareholders of **Employer** of a reorganization, merger, consolidation or other form of corporate transaction or series of transactions, in each case, where the persons who were the shareowners of **Employer** immediately prior to such organization, merger or consolidation or other transaction do not, immediately thereafter, own more than fifty percent (50%) of the combined voting power of the succeeding corporation. This voting power is generally entitled to vote for election of directors of the newly reorganized, emerged, or consolidated company resulting in new outstanding voting shares, or

(ii) **Employer** liquidates or dissolves the company, or

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 3 of 15

Initials _____
Employee

(Ver H05)

(iii)     The acquisition by any person, entity or "group" of more than fifty percent (50%) of the then outstanding shares of **Employer's** common voting stock, or

(iv)     The sale of all or substantially all of the assets of **Employer.**

## 5.     UNIQUENESS OF SERVICES OF EMPLOYEE

**Employee** hereby warrants and represents that the services he intends to provide under this Agreement are of a special, unique, unusual, extraordinary and intellectual character that gives him a peculiar value, the loss of which cannot be reasonably or adequately compensated by damages in an action at law. **Employee**, therefore, expressly agrees that **Employer** shall be entitled to injunctive and other equitable relief to prevent a breach of this Agreement by **Employee** in addition to any other rights or remedies that **Employer** may possess and to the maximum extent permitted by law. Any action for injunctive relief under this paragraph should not be subject to the provisions in this Agreement related to the alternative dispute resolution process.

## 6.     NON-DISCLOSURE OF CONFIDENTIAL INFORMATION COVENANTS

(a)     "Confidential Information" shall include, but not be limited to, regardless of form, all: (i) customer lists, affiliates, referral source lists, prospect lists, investor lists, vendor lists, client lists, databases, and personnel records; (ii) financial information concerning **Employer** and its operations; (iii) methods of organizing and conducting **Employer's** business as such methods, relate to **Employer's** sales, accounts, borrowers, customers, financing products or techniques, employees and referral sources; (iv) information relating to **Employer's** proprietary rights prior to any permitted public disclosure thereof, including, but not limited to, the nature of the proprietary rights, the status and details of research and development of products and services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including trademarks and trade names); and, (v) other information, whether or not originated by **Employee**, which is used in **Employer's** business and is (a) proprietary to, about, or created by or for **Employer**; (b) information which gives **Employer** some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of **Employer**; (c) designated as confidential information by **Employer**, or from all of the relevant circumstances should reasonably be assumed by **Employee** to be confidential and proprietary to **Employer**, or (d) is not generally known by persons other than **Employer**; all of which information, lists, schedules, records or methods are obtained by **Employee** from **Employer** or through **Employee's** performance of duties hereunder. Confidential Information shall include all of the foregoing whether the same are produced by **Employee** or any other employee, agent or affiliate of **Employer** and all physical, tangible, or intangible embodiments or repositories (including any and all photocopies thereof) of the foregoing but shall not include information or matters that are a trade secret under applicable law.

(b)     **Employee** acknowledges and agrees that (i) **Employer** has expended and will continue to expend considerable and substantial time, effort and capital resources to develop the Confidential Information, (ii) the Confidential Information is innovative and proprietary in nature to **Employer** and must receive confidential treatment to protect **Employer's** proprietary interest therein from irreparable damage, (iii) **Employee** by virtue of **Employee's** employment relationship with **Employer**, will have access to the Confidential Information, and (iv) the Confidential Information and all physical, tangible and intangible embodiments or other repositories of the Confidential Information shall be and at all times remain the sole and exclusive property of **Employer**. **Employee** further acknowledges that specialized training, unique to **Employer** and not otherwise available from any other source, has been provided to **Employee** at much cost, time and expense to **Employer**. This training is not available from any school, available courses or from any source whatsoever but from the continued intense training offered by **Employer** to **Employee** as partial consideration for this Agreement.

Initials 
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 4 of 15

Initials
Employee

(Ver H05)

(c)　For the period of the Employment Term through the date which is three (3) years after termination of employment, **Employee** agrees that **Employee** will not, without the prior written consent of **Employer**, which consent may be withheld in the **Employer's** sole and absolute discretion, disclose or make available any Confidential Information to any person or entity (verbally or in writing), nor shall **Employee** make or cause to be made, or permit or allow, either on **Employee's** own behalf or on behalf of others, any use of the Confidential Information then in **Employee's** knowledge, custody, control or possession.　**Employee** further agrees that immediately upon termination of **Employee's** employment with **Employer** for any reason or at any other time requested by **Employer** and as a condition precedent to **Employee's** receipt of any payments then due **Employee** from **Employer** under this Agreement, **Employee** shall promptly deliver to **Employer** any and all property belonging to **Employer**, including without limitation, all Confidential Information (including all physical, electronic, or other repositories thereof) in **Employee's** custody, control or possession.

(d)　**Employee** acknowledges that during the Employment Term, from time to time, **Employee** may have access to (directly or indirectly), or receive information from or regarding the **Employer** or its affiliates in the nature of trade secrets, the release of which may be damaging to **Employer** or its affiliates.　**Employee** agrees to hold in strict confidence any information it receives regarding the **Employer** or its affiliates that is considered a trade secret and shall not disclose such information to any other person or entity, and will take all necessary steps to prevent any other person or entity from discovering the trade secrets.　Accordingly, **Employee** agrees that the provisions of this Paragraph 6(d) may be enforced by temporary and permanent injunction, in addition to all other remedies provided by law and equity.　Furthermore, **Employee** acknowledges and agrees that theft of trade secrets may subject **Employee** to certain sanctions and criminal penalties under the Economic Espionage Act of 1996 (18 U.S.C., Sections 1831 to 1839).

## 7.　PROTECTIVE COVENANTS

(a)　"Protected Parties" or "Protected Party" shall mean (i) all prospective customers, affiliates, partners, borrowers and referral sources of **Employer** with whom **Employee** has had direct contact as an employee of **Employer** during the eighteen (18) month period immediately preceding the termination of **Employee's** employment with **Employer**; (ii) all customers, affiliates, partners, borrowers and referral sources who have purchased, contracted, engaged or referred others to **Employer** for products, services or financing from **Employer** during the eighteen (18) month period immediately preceding the termination of **Employee's** employment with **Employer** and with whom **Employee** had direct contact as an employee of **Employer**; and (iii) all employees of **Employer** employed by **Employer** as of the termination date with whom **Employee** had direct contact while employed by **Employer**.

(b)　Except for or on behalf of **Employer**, **Employee** agrees that for the period of the Employment Term through the date which is two (2) years after termination of employment, **Employee** shall not on **Employee's** own behalf or in the service or on behalf of others, solicit, divert, pirate or appropriate, or attempt to solicit, divert, pirate or appropriate, to **Employee** or any other person or entity, any of the Protected Parties in connection with the provision of services, products or financing in competition with **Employer**, or otherwise interfere or attempt to interfere with **Employer's** relationship with the Protected Parties.

## 8.　RESTRICTIVE COVENANTS – INDEPENDENT COVENANTS

(a)　**Employee** agrees that while working for the **Employer** and for a period of eighteen months (18) immediately following the termination of employment for any reason whatsoever or no reason at all, **Employee** shall not provide, directly or indirectly, services similar to those **Employee** is

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 5 of 15

Initials _____
Employee

(Ver H05)

providing to **Employer** under this Agreement, to any person or entity that provides services substantially similar to those of **Employer**.

(b)     Except in performance of this Agreement, **Employee** shall not during the term of this Agreement and for eighteen (18) months following termination of employment for any reason whatsoever or no reason at all, solicit, either directly or indirectly, any Protected Party for the purpose of encouraging or inducing such Protected Party to purchase or obtain specialized financial services or related to any other product/services provided by **Employer** as of the date of this Agreement and through the date of the termination of **Employee's** employment.

(c)     **Employee** further acknowledges that this covenant is an independent covenant within this Agreement. **Employee** acknowledges actual receipt of good and valuable consideration for the purpose of executing this covenant, as well as other consideration stated herein and including the consideration of continued employment by **Employer**.

(d)     **Employee** recognizes that the terms of this covenant found in Paragraphs 6, 7 and 8 are reasonable and necessary for the protection of the **Employer's** unique and national business, and shall survive the termination of this Agreement.

(e)     The provisions of the covenants found in Paragraphs 6, 7 and 8, as well as the period of time, geographical areas and types and scope of restrictions of **Employee's** activities specified herein are intended to be divisible; and, in the event any provision herein shall be deemed invalid or unenforceable in any respect, as to any one or more periods of time, geographical areas, business or activities, the remaining provisions shall not thereby be effected but shall, to the extent allowed by law, remain in full force and effect; and this Agreement shall, to the extent allowed by law, be deemed to be amended without further action by the parties hereto to the extent necessary to render it valid and enforceable.

(f)     **Employee** acknowledges that the covenants in Paragraphs 6, 7 and 8 are independent of the existence of any agreement, claim or cause of action that **Employee** may ever have against **Employer**, whether predicated on this Agreement or otherwise and shall not constitute a defense to the enforcement by **Employer** of this Agreement not to compete.

## 9.     DEVOTION BY EMPLOYEE OF FULL-TIME TO BUSINESS

(a)     Except as otherwise agreed to by **Employer** in writing, **Employee** shall devote all of his time, attention, knowledge and skills solely and exclusively to the business and interests of **Employer** during normal working hours. **Employer** shall retain all of the benefits, emoluments, profits or other returns from or incidental to any and all work, services, advice and mental efforts of **Employee** that arise during the term of this Agreement, or such other amount as agreed to in writing by **Employer's** Board of Directors.

(b)     **Employee** shall not directly or indirectly, act as a partner, officer, director, stockholder, adviser, employee, or affiliate in any other business or trade that is related to that of **Employer**, except as otherwise agreed to in writing. **Employee** may invest his funds in the capital stock of a direct or indirect competitor of **Employer** only if said holdings represent less than five percent (5%) of the total number shares or principal amount of the securities of said issuer outstanding.

(c)     **Employee** shall provide **Employer** a confidential list of all current business and commercial interests, other than holdings inside of an ERISA qualified retirement account or any holdings of any kind or nature that are less than five percent (5%) of the value of any enterprise or venture (whether such holdings are held directly or indirectly by **Employee**).

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 6 of 15

Initials _____
Employee

(Ver H05)

(d)     Any future business and commercial interests, other than those set forth under Paragraphs 9(b) and 9(c) hereinabove, must be disclosed to **Employer** at least thirty (30) days prior to **Employee** acquiring any such interests. **Employee** acknowledges that the reason for the disclosure of such interests is because **Employer** and its affiliates have diverse holdings and are subject to various federal and state securities laws, as well as certain contractual vendor obligations with both public and private companies, making it necessary to disclose such information so that **Employer** does not violate any contracts, covenants, federal or state laws.

(e)     Failure of **Employee** to provide **Employer** with a list of all current business and commercial interests and/or failure of **Employee** to disclose any future business and commercial interests in accordance with Paragraph 9 shall subject **Employee** to default under this Agreement, resulting in the immediate termination of this Agreement and **Employee's** forfeiture of all benefits, compensation and interests held pursuant to this Agreement, at the time of termination.

## 10.     INDEMNIFICATION OF EMPLOYER AND INDEMNIFICATION OF EMPLOYEE

(a)     Unless acting under the direction of **Employer**, **Employee** shall hold harmless, indemnify and defend **Employer** from any and all claims, demands, damages, losses, expenses, attorneys' fees, causes of action, judgments and liability arising out of or in connection with **Employee's** breach of any representation, warranty, or agreement made under this Agreement, or arising out of any fraudulent or deliberate wrongful acts of **Employee** during **Employee's** engagement or representation to others as an **Employee**, independent contractor, or other affiliate of **Employer**.

(b)     **Employer** shall hold harmless, indemnify and defend **Employee** from any and all claims, demands, damages, losses, expenses, attorneys fees, causes of action, judgments and liability arising out of any fraudulent or deliberate wrongful acts of **Employer**, independent contractor or other affiliate of **Employer** and further for any acts or omissions arising out of **Employee's** employment with **Employer** unless caused by the active gross negligence of **Employee**.

## 11.     RELEASE OF PRIOR CLAIMS

**Employee**, for and in consideration of the payment of One Dollar ($1.00), and other good and valuable consideration, in hand paid, the receipt and sufficiency of which is hereby acknowledged, hereby agrees, to release, cancel, forgive and forever discharge **Employer**, each of its predecessors, parent corporations or companies, holding companies, subsidiaries, affiliates, divisions, successors and assigns, and all of its/their officers, directors, members and employees from all actions, claims, demands, damages, obligations, liabilities, controversies and executions, of any kind or nature whatsoever, whether known or unknown, whether suspected or not, which have arisen, or may have arisen, or shall arise by reason of the prior employment by **Employer** of **Employee**. Furthermore, **Employee** hereby acknowledges that **Employee** has no present or past claims of any nature against **Employer**. **Employee** specifically waives any claim or right to assert any cause of action or alleged cause of action or claim or demand which has, through oversight or error, intentionally or unintentionally or through a mutual mistake, been omitted from this section. This release shall be effective from the beginning of time until the date hereof.

## 12.     ALTERNATIVE DISPUTE RESOLUTION

All claims, duties, disputes and other matters in question by and between **Employee** and **Employer** shall be decided by final binding Arbitration under and in accordance with the provisions of Chapter 682, Florida Statutes, with exclusive venue for such Arbitration, and for any judicial proceedings to enforce the terms and conditions of this provision requiring Arbitration, or to confirm such Arbitration Award, to

be only in the Court of appropriate jurisdiction in Orange County, Florida. Provided further, that in the event for any reason a dispute under this Agreement is not subject to the Florida Arbitration Code, then in such event such dispute shall be decided by final binding Arbitration under and in accordance with the provisions of the Federal Arbitration Code, with exclusive venue likewise to be in Orange County, Florida, in the same manner as provided above. If there is no jurisdiction for such dispute under the Federal Arbitration Code, then such disputes shall be decided by Arbitration in accordance with Rules of the American Arbitration Association then in effect, with exclusive venue likewise to be in Orange County, Florida, in the same manner as provided above. The prevailing party in any Arbitration under this Agreement, including in any litigation required to enforce the terms and conditions of this Arbitration Provision, including to confirm an Arbitration Award, shall be entitled to recover their reasonable attorney's fees and consulting fees, and in addition, any taxable costs (including Arbitrator compensation) as are otherwise allowed in the Arbitration and for litigation to enforce the terms of this Arbitration provision or to confirm any Arbitration Award. This provision specifically authorizes the Arbitrator(s), within his (their) discretion, to tax in favor of the prevailing party that fees and costs of the Arbitration proceedings, to include Arbitrator compensation, filing fees, subpoena service fees, expert witness fees and costs, and out-of-pocket costs for a hearing room to conduct the proceeding.

## 13. MISCELLANEOUS PROVISIONS

(a)     This Agreement contains the sole and entire agreement between the **Parties** and shall supersede any and all other agreements between the **Parties** except for any covenant not to compete, covenant not to solicit, confidentiality agreement, or amended compensation agreement signed by both **Parties**. The **Parties** acknowledge that they have read this Agreement in its entirety and that any oral or written statements to the contrary are void and that neither **Party** has relied on any such representation in connection with this Agreement.

(b)     The **Parties** agree that no waiver or modification of this Agreement or of any covenant, condition, or limitation contained within it is valid unless it is in writing, clearly identified as a modification or waiver of this Agreement, or one of the clauses of this Agreement, and duly executed by both **Parties**. The **Parties** further agree that neither shall submit or attempt to submit any waiver or modification into evidence in any proceeding, arbitration, or litigation between the **Parties** arising out of or affecting this Agreement, or the rights or obligations of any **Party** under it, unless such waiver or modification is in writing, clearly identified as a modification or waiver of this Agreement or one of the clauses of this Agreement, and duly executed by both **Parties**.

(c)     The laws of the State of Florida govern this Agreement and performance under it at the exclusion of the laws of any other forum or jurisdiction irrespective of the particular jurisdiction in which any action or proceeding is instituted.

(d)     In the event that one or more provisions in this Agreement are held invalid or unenforceable, the remaining provisions shall remain in full force and effect.

(e)     Any waiver or modification of any breach of one or several provisions contained in this Agreement shall not be considered as a waiver of any subsequent breach of the same or other provisions of this Agreement.

(f)     The headings and titles used in this Agreement are for the reference and convenience of the **Parties** and do not serve to limit or change the meaning of any provision contained in this Agreement. All personal pronouns used in this Agreement, whether in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural; and the plural shall include the singular.

(g)     Any **Party** required to provide notice to the other **Party** pursuant to this Agreement may affect such notice by personal delivery in writing or by certified mail, postage prepaid, return receipt requested. A **Party** mailing a notice shall address it to the relevant **Parties** at the addresses appearing in the introductory paragraph of this Agreement, but any **Party** may change its notice address in accordance with this paragraph. The **Parties** hereby deem any personally delivered notice as delivered on the date of actual receipt, provided the notice is signed by the person named in the notice or if the receipt refuses to sign such notice, then by the date of a notation as the delivering **Party** may show that communicates an attempted, but unclaimed or refused, delivery.

(h)     Failure to insist upon strict compliance with any of the terms, covenants or conditions hereof, shall not be deemed a waiver of such terms, covenants or conditions, nor shall any waiver or relinquishment of any right or power hereunder, at any one time or more times, be deemed a waiver or relinquishment of such right or power at any other time or times.

(i)     This Agreement shall be binding on, and inure to the benefit of, the successors and assigns of **Employer**. **Employee** shall have no right to assign this Agreement, but **Employer**, at its sole discretion, shall have the right to assign it.

(j)     This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall comprise but a single instrument.

(k)     No provision of this Agreement shall be construed against, or interpreted to the disadvantage of, any **Party** hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have drafted, structured, dictated or required such provision.

**EMPLOYEE CERTIFIES THAT EMPLOYEE READ THE ENTIRE CONTENTS OF THIS AGREEMENT BEFORE EXECUTING SAME; THAT EMPLOYEE FULLY UNDERSTANDS ALL THE TERMS, CONDITIONS AND PROVISIONS SET FORTH IN THIS AGREEMENT, PARTICULARLY INCLUDING, BUT NOT LIMITED TO, EMPLOYEE'S FIDUCIARY AND CONFIDENTIAL RELATIONSHIP WITH EMPLOYER AND EMPLOYEE'S PROTECTIVE COVENANTS AND AGREEMENTS; THAT EMPLOYEE HAS RECEIVED A COPY OF THIS AGREEMENT AS SIGNED BY EMPLOYEE; AND THAT EMPLOYEE BEING BOUND BY THIS AGREEMENT IS A CONDITION PRECEDENT TO EMPLOYER'S ENGAGEMENT OF EMPLOYEE'S SERVICES AND EMPLOYER'S EXECUTION OF THIS AGREEMENT.**

**BY SIGNING BELOW AND INITIALING THE BOTTOM OF EACH OF THE PRECEDING EIGHT (8) PAGES, AS WELL AS THE ATTACHED SCHEDULES, THE PARTIES AGREE TO THE TERMS AND CONDITIONS HEREOF.**

**EMPLOYER:**                                                        **EMPLOYEE:**
**Common Paymaster Corp**
A Florida corporation

By:                                                                      By:

Print Name:  **Martin C. Flynn, Jr.**            Print Name:  PAUL S. Grove

Print Title:            **President**                   Print Title:

Date:   1/16/06                                          Date:   1/5/2006

                                                                      Social Security Number: 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

## Schedule "A"
## __JOB DESCRIPTION__

**Employee's** duties and responsibilities shall include, but not be limited to:
- The business development and/or management of any current or prospective client-related activities.

Initials  X
 Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 10 of 15

Initials _____
 Employee

(Ver H05)

## Schedule "B"
## POLICIES

**Employee** agrees to use **Employee**'s best efforts to do the following:

- Identify and schedule work related to **Employee**'s businesses.

- Make a weekly report to **Employer** regarding the status of any significant projects on which **Employee** is working.

- Make a full disclosure of any existing business. All future business will be run through **Employer**'s screening processes.

- Complete and turn in weekly timesheets.

- Deliver all PIN numbers and pass codes relating to the business financial account, along with full disclosure of any activities on any business account to **Employer**.

- Deliver personal biographical materials to **Employer** to be published in advertising, marketing or promotional materials and on company websites of **Employer** and its affiliates. By delivering such biographical materials to **Employer**, **Employee** hereby expressly grants **Employer** and its affiliates the nonexclusive right to use **Employee**'s name, biographical materials and likeness in connection with advertising, marketing or promotional materials, and websites of **Employer** and its affiliates.

- **Employee** agrees that any communication received or sent by **Employee** at his employment location, whether voice, email, or regular mail shall be subject to review and inspection by **Employer** at any time.

Initials_____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 11 of 15

Initials_____
Employee

(Ver H05)

# Schedule "C"
## COMPENSATION

Employee shall be compensated in accordance with Schedule "C-1a" or "C-1b" in accordance with **Employee's** then current Primary Classification. Such compensation shall consist of "Base Compensation" and "Incentive Compensation" as identified in Schedule "C-1a" or "C-1b" attached hereto and incorporated by reference herein.

Incentive Compensation shall consist of the grant to **Employee** on an annual basis of preferred shares of **Mirabilis Ventures, Inc.,** a Nevada corporation ("Mirabilis"), each preferred share (a "Preferred Share") having a face value of One Thousand Dollars ($1,000), and bearing a coupon rate of six percent (6%) (the "Coupon"). Preferred Shares shall be granted to **Employee** on the basis of the formula (position and longevity) set forth in Schedule "C-2," attached hereto and incorporated by reference herein, whenever there are **Employer** net revenues sufficient to enable grants to all employees eligible for such grants (the "Formula"). The Preferred Shares shall not be granted to **Employee** until **Employee** completes their second full year of employment, after which **Employee** shall receive **Employee's** Preferred Shares in accordance with Schedule "C-2." Thereafter, **Employee** shall continue to receive their Preferred Shares, in accordance with Schedule "C-2", on the yearly anniversary of the date of execution of this Agreement. The Coupon shall be paid annually to **Employee**. Incentive Compensation may also consist of yearly discretionary monetary bonuses and yearly discretionary stock bonuses. Both bonuses shall be determined by the Board of Directors of **Employer** and shall be based upon certain performance goals of **Employer** as set by the Board of Directors.

Based on the Formula, whenever three thousand (3,000) Preferred Shares have been granted to **Employee, Employee** shall be eligible to be a Preferred Member, and as a Preferred Member, shall have the right to vote, with other Preferred Member, on the admission of new Preferred Members. **Employee** becomes a Preferred Member whenever one-half (1/2) of all current Preferred Members' vote to grant preferred membership status to **Employee**.

Based on the Formula, whenever five thousand (5,000) Preferred Shares have been granted to **Employee**, **Employee** shall be eligible to have "Tenure," and as such a "Tenured Member," shall have the right to vote, with other Tenured Members, on the admission of new Tenured Members. An **Employee** has Tenure and becomes a Tenured Member whenever two-thirds (2/3) of all current Tenured Members vote to grant Tenure to **Employee**, and the permission of a majority in ownership of the common stock of Mirabilis vote to allow **Employee** to be granted Tenure also. Tenured Members shall have such other rights and privileges as Mirabilis shall determine from time to time. The maximum number of Preferred Shares that **Employee** may earn shall be five thousand (5,000).

Tenured Members shall select the boards of directors of Mirabilis' various affiliated companies that **Employee** shall serve on, and **Employee** shall thereby be entitled to receive the additional compensation listed in the Formula for such services.

All voting rights granted under this Agreement shall be subject to Mirabilis' Shareholders Agreement.

Initials _____
Employer

Common Paymaster Corp Employment Agreement – Paul Glover
Page 12 of 15

Initials _____
Employee

(Ver H05)

# EMPLOYEE COMPENSATION RANKS, TITLES & COMPENSATION

*Vice President* – Officer performing primarily professional and advisory services for clients.

*Administrative Vice President* – Officer in a regional office who performs primarily management functions instead of client services.

*Senior Vice President* – Officer in charge of client selection and case assignments in a geographic region.

*Senior Regional Officer (SRO)* – Professional in charge of managing regional organization operations by directing and coordinating activities consistent with established goals, objectives, and policies.

*Executive Vice President* – Officer at corporate office performing primarily management functions, such as Business Development, Operations, Corporate Relations, Controller, Treasurer, Corporate/General Counsel, and Secretary.

| Classification | Hourly Rate | Base Compensation | Directors Fee (Incentive Compensation) |
|---|---|---|---|
| 1. General Analyst | 75 | 48,000 | -- |
| 2. Senior Analyst | 80 | 54,000 | -- |
| 3. Expert Analyst | 90 | 60,000 | 25% |
| 4. General Advisor | 100 | 66,000 | 25% |
| 5. Senior Advisor | 125 | 72,000 | 33.33% |
| 6. Expert Advisor | 150 | 84,000 | 33.33% |
| 7. Expert Advisor II | 150 | 90,000 | 33.33% |
| 8. General Strategist | 200 | 96,000 | 40% |
| 9. General Strategist II | 200 | 108,000 | 40% |
| 10. Senior Strategist | 250 | 120,000 | 40% |
| 11. Senior Strategist II | 250 | 132,000 | 40% |
| 12. Senior Strategist III | 250 | 144,000 | 40% |
| 13. Expert Strategist | 300 | 150,000 | 40% |
| 14. Master Strategist | 400 | 180,000 | 50% |
| 15. Grand Strategist | 500 | 240,000 | 50% |
| 16. Grand Strategist II | 500 | 300,000 | 50% |
| 17. Nexial Strategist | ∞ | ∞ | N/A |

1. All professional staff are also entitled to receive referral, sourcing and other fees or commissions on work referred to the firm as if professional was an independent representative.

2. All professionals except General Analyst and Senior Analyst are eligible for selection by Mirabilis' "Tenured Members" as directors for which additional compensation is paid.

3. All professionals shall receive performance bonus should personal billings exceed 3 times base compensation.

4. All professionals shall receive retention consideration as set forth in retention program.

5. All professionals shall be eligible for discretionary bonuses awarded by **Employer's** BOD or designate.

Initials _____ Employer    Common Paymaster Corp Employment Agreement – Paul Glover    Page 13 of 15    Initials _____ Employee

(Ver H05)

***Sales Regional Manager*** – Officer, with sales supervising and management experience, who shall control and direct Sales Managers, Sales Specialists and Sales Representatives in a geographic region.

***Sales Manager*** – Officer in a regional office who performs primarily general sales management functions over Sales Specialists and Sales Representatives instead of client services.

***Sales Specialist*** – Individual who has formal training in selling Mirabilis', and its affiliates', products and services.

***Sales Representative*** – Individual who is designated to sell a specific product and/or service for the benefit of Mirabilis and its affiliates.

| | Classification | Hourly Rate | Base Compensation |
|---|---|---|---|
| 1. | Sales Representative | 35.00 | 24,000 |
| 2. | Sales Specialist | 50.00 | 36,000 |
| 3. | Sales Manager | 75.00 | 48,000 |
| 4. | Sales Regional Manager | 125.00 | 72,000 |

1. All sales professional staff are also entitled to receive referral, sourcing and other fees or commissions on work referred to the firm as if sales professional was an independent representative.

2. Sales Regional Manager is eligible for selection by Mirabilis' "Tenured Members" as directors for which additional compensation is paid.

3. All sales professionals shall receive retention consideration as set forth in retention program.

4. All sales professionals shall be eligible for discretionary bonuses awarded by **Employer's** Board BOD or designate.

# Schedule "C-2"
## PREFERRED STOCK SCHEDULE

| Staff | Annual Shares | Cumulative Shares |
|---|---|---|
| Year 1 | - | - |
| Year 2 | 50 | 50 |
| Year 3 | 50 | 100 |
| Year 4 | 100 | 200 |
| Year 5 | 100 | 300 |
| Year 6 | 100 | 400 |
| Year 7 | 150 | 550 |
| Year 8 | 150 | 700 |
| Year 9 | 150 | 850 |
| Year 10 | 150 | 1,000 |
| Year 11 | 100 | 1,100 |
| Year 12 | 100 | 1,200 |
| Year 13 | 100 | 1,300 |
| Year 14 | 100 | 1,400 |
| Year 15 | 100 | 1,500 |
| Year 16 | 100 | 1,600 |
| Year 17 | 100 | 1,700 |
| Year 18 | 100 | 1,800 |
| Year 19 | 100 | 1,900 |
| Year 20 | 100 | 2,000 |
| | | |
| Executive | | |
| Year 1 | - | - |
| Year 2 | 100 | 100 |
| Year 3 | 200 | 300 |
| Year 4 | 300 | 600 |
| Year 5 | 400 | 1,000 |
| Year 6 | 200 | 1,200 |
| Year 7 | 200 | 1,400 |
| Year 8 | 200 | 1,600 |
| Year 9 | 200 | 1,800 |
| Year 10 | 200 | 2,000 |
| Year 11 | 200 | 2,200 |
| Year 12 | 200 | 2,400 |
| Year 13 | 200 | 2,600 |
| Year 14 | 200 | 2,800 |
| Year 15 | 200 | 3,000 |
| Year 16 | 200 | 3,200 |
| Year 17 | 200 | 3,400 |
| Year 18 | 200 | 3,600 |
| Year 19 | 200 | 3,800 |
| Year 20 | 200 | 4,000 |
| Year 21 | 200 | 4,200 |
| Year 22 | 200 | 4,400 |
| Year 23 | 200 | 4,600 |
| Year 24 | 200 | 4,800 |
| Year 25 | 200 | 5,000 |